[Crim. No. 9801. In Bank. Feb. 10, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. BOOKER T. HILLERY, JR., Defendant and Appellant.

Booker T. Hillery, Jr., in pro. per., and Marvin W. Friedman, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—In the original trial of this case the jury found defendant guilty of first degree murder and fixed the penalty at death. Upon appeal this court, pursuant to *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], reversed the verdict as to penalty but affirmed the conviction of guilt, holding that the use of statements obtained in violation of *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], did not work prejudice under article VI, section 13,█ of the Constitution of California. At a subsequent trial, commencing September 28, 1965, the jury again fixed the penalty at death. The court denied defendant's motion for a new trial and entered judgment on the verdict. This appeal comes to us automatically under Penal Code section 1239, subdivision (b).

Defendant asserts that the trial court committed seven prejudicial errors in that: (1) the court permitted the introduction of evidence obtained by illegal search and seizure; (2) the court permitted the introduction of evidence of defendant's prior offenses and failed to caution the jury as to the use of such evidence; (3) the court allowed defendant to be present in court dressed in prison garb and manacled; (4) the court rejected two instructions requested by defendant; (5) the court denied defendant's motion for a mistrial on grounds of misconduct of jurors; (6) the court discussed

legal issues with counsel in the presence of the jury; and (7) the court disparaged defendant and defense counsel.

Briefly recapitulating the facts, we note that the evidence at the penalty trial disclosed that on the night of the murder, March 21, 1962, the victim, Marlene Miller, age 15, was alone in her rural home near Hanford with the doors unlocked, the shades up, and lights burning. Her parents and brother left for the evening at 6:15 p.m.; the parents returned at 9:55 p.m. to find Marlene missing, and the television, sewing machine, and iron turned on. A friend who spoke with Marlene by telephone placed her at home at 8:30 p.m. On the floor of the master bedroom Mr. Miller found a coat and blanket, and a sleeping bag normally stored away; outside on the grass he discovered the screen to Marlene's bedroom window. He thereupon called police.

Chief Deputy Thomas supervised the investigation. He found a gloved handprint intruding inward on the television set near the open window in Marlene's bedroom. Officer Webb observed scuff marks outside the window, seemingly caused by a shoe being dragged across the ground; he likewise discovered a trail of bloodspots, as well as footprints and prints of a small tennis shoe, which led to the bank of a nearby deep irrigation ditch. Here, at dawn, a news reporter called Webb's attention to Marlene's partially nude body, submerged in the water, a pair of sewing shears deeply embedded in her chest. Her wrists were tied behind her back with cord similar to that found missing from the sleeping bag; one of her tennis shoes was missing; a towel and Marlene's slip were knotted about her neck. Her blouse was pulled down around her arms and her brassiere was pulled above her breasts; her jeans and underpants were torn open at the crotch. Her legs were drawn up and spread apart, although there was no other sign of sexual assault.

Two witnesses observed an automobile similar to the defendant's uniquely painted black and turquoise 1952 Plymouth parked in Tome Lane, two-tenths of a mile from the Miller home. Chief Deputy Thomas observed tire tread marks in Tome Lane, and bootprints leading from Tome Lane toward the Miller house and footprints leading back. Informed that a car registered to defendant and similar to the one observed in Tome Lane earlier had been cited for illegal parking in front of defendant's hotel, Thomas observed the car after 3 a.m. without entering it. He noted the similarity between the tire treads and the marks found in Tome Lane, as

well as the comparability of prints of the boots and the soles of the hip boots visible on the floor of the car. Thomas knew of defendant's prior conviction for rape as well as of his employment at the Ferreira ranch, one-half mile from the Miller house, where Marlene had worked as a babysitter. Shortly after finding Marlene's body, therefore, Thomas ordered defendant's arrest.

Officer Evers apprehended defendant in the morning in his car in front of his hotel. Seeing a pair of hip boots on the floor, the arresting officer had the car driven to the police garage and impounded. Subsequent search, pursuant to a warrant, revealed a sales slip for $1.29 from an Army surplus store. This discovery linked defendant to a glove found at the scene of the crime because a store manager recalled selling to defendant, for an on-sale price of $1.29, a pair of gloves which were of the same type as the discovered glove. Impressions of the boots matched bootprints found at the scene; inked tire tread impressions also corresponded with those found in Tome Lane. Officer Evers found a crisp 10-dollar bill and change including 10 nickels in defendant's pockets after his arrest; Marlene's brother testified that the bill resembled in texture and creasing one taken from his dresser the night of the murder; he further testified that a mug partially filled with nickels had been emptied.

The right glove of the mismatched pair, as well as a belt found at the scene of the crime, further implicated defendant. We previously noted the facts regarding the left glove; the right glove, black with red orlon lining, was identified by defendant's girl friend at the guilt trial as similar to a pair he had bought in December 1961. Indeed, defendant had complained to her a week before the murder that he had lost one glove. Defendant's employer also testified that defendant, two weeks before the murder, had complained about losing a glove; subsequently defendant wore a mismatched pair like the two found at the scene. When found the morning after the crime, the gloves were both soaking wet, but a belt discovered near the water-filled irrigation ditch was dry. The belt, at the sides, bore two marks of the kind made by clips which hold up hip boots; defendant's employer described the belt as similar to the one used by defendant to hold up hip boots while at work.

Prior to the commencement of the penalty trial which is the subject of this appeal, defendant, during the period between

June 12, 1965, and September 13, 1965, entered six appearances in propria persona before the court for setting the date of trial, motions, petitions for writs of mandamus and prohibition, and further related proceedings. The extended colloquies between the court and defendant, which bear on the issues raised here, involved four subjects: (1) representation by counsel, (2) request for documents, (3) motion for stay of proceedings, and (4) disqualification of the judge. Upon all of the issues the trial court, as we shall explain, afforded all reasonable accommodation to defendant's demands; we can find no infringement of defendant's rights or abuse of the court's discretion.

First. Discharging the attorneys who had served him in the first trial and on appeal, defendant declined to accept the substituted attorneys appointed by the court to represent him in the second penalty trial. The court properly rejected the defendant's demand for still other attorneys but made available to him the appointed attorneys in an advisory capacity. The court also properly rejected defendant's demands that proceedings be continued until he vindicated his claimed Sixth Amendment rights. Until the second day of the trial, before the advent of the State's opening argument but after *voir dire* of the jury panel, defendant continued to represent himself. At this point defendant accepted his advisory counsel in a full representative capacity. Defendant exercised no peremptory challenges, failed to question any prospective juror, and, except to object to the entire trial, declined to enter into the proceedings.

Second. Defendant presented several motions for the production of documents. Most of his requests failed to specify any particular document; those documents specifically requested appear irrelevant to any trial preparation of his own. In support of his petition for writ of certiorari to the United States Supreme Court, defendant sent the entire record to Washington, D.C. That court did not order the trial proceedings stayed. The trial court made the prosecutor's record available for copying by defendant's attorneys at county expense.

Third. Asserting that his case was pending before the United States Supreme Court, defendant, in connection with his requests for counsel and documents, moved several times for stays of proceedings. Since no other court had ordered a stay and defendant's inconvenience arose from his own making, the trial court properly denied his motions.

■ Fourth. The court properly denied, as not timely made and not supported by timely affidavit, defendant's motion under Code of Civil Procedure section 170.6 to disqualify the trial judge for prejudice. Since the statute permits only one such motion, we must decide whether defendant's first motion for disqualification, which he urged orally on July 12, 1965, after the commencement of the second hearing preceding his second penalty trial, complies with the statutory provisions.[1]

Section 170.6 requires that when the defendant knows at least 10 days before the hearing that the judge will preside, defendant must move for disqualification at least five days before such hearing. In any event, defendant must so move no later than the commencement of the hearing. The section further requires the motion to be supported by affidavit or oral statement under oath. A motion for disqualification could not, before the subsequent amendment of section 170.6, be presented after the judge had ruled on an issue of law (*Mancini* v. *Superior Court* (1964) 230 Cal.App.2d 547, 557 [41 Cal.Rptr. 213]).

Defendant complied with none of the foregoing requirements. The same trial judge presided at defendant's earlier guilt and penalty trials. Defendant did not file his first motion for disqualification five days before the hearing, nor even at the commencement of the hearing. He did not support it by affidavit or oral statement under oath at the time required for filing. Defendant presented his motion after the judge had denied his motions to stay all proceedings, to furnish documents and to appoint new counsel. The trial court therefore properly denied the motion under section 170.6.

In summary, viewing as a whole defendant's inept attempts to handle his own case until the second day of trial, we cannot conclude that he suffered unfair treatment or prejudice. When he finally consented to be represented by counsel, defendant's attorneys obtained another month's continuance for preparation. The court both clearly explained to defendant his constitutional rights and attempted to persuade him to accept appointed counsel; defendant cannot now successfully urge his own not unexpected ineptitude.

---

[1]After the date of defendant's first motion for disqualification, the statute was amended to permit challenge when a judge has presided at preliminary hearings prior to trial not involving determination of contested issues of fact relating to the merits. The amended statute, however, continued to permit only one motion under section 170.6. We decide the sufficiency of defendant's motion according to the law then in effect.

### 1. *Introduction of evidence obtained by illegal search and seizure*

Defendant urges that the court erred in permitting the introduction into evidence of his boots, which had been obtained from the search of his automobile. He claims that the search cannot rest either upon the theory that probable cause supported his arrest and that the search was incident to it, or upon the subsequent issuance of a search warrant. We point out that even if such an argument may now properly be addressed to us, the arrest quite clearly rested upon probable cause.

■ If defendant had failed to adduce substantially different evidence on the issue at the new trial, we could dispose of the search and seizure issue without considering its merits by relying upon *People* v. *Terry* (1964) 61 Cal.2d 137, 151 [37 Cal.Rptr. 605, 390 P.2d 381]. In *Terry* we held that in such circumstances a prior appellate ruling that a search was lawful constituted the law of the case. On appeal of defendant's first penalty judgment we held the evidence presently questioned was legally obtained. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 710 [44 Cal.Rptr. 30, 401 P.2d 382].) At the second penalty trial, however, defendant's counsel developed a more extensive record on the actual knowledge of the officer ordering defendant's arrest; defendant still fails to sustain the contention.

■ To constitute probable cause for arrest, a state of facts must be known to the officer that would lead a man of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person arrested is guilty. (*People* v. *Stewart* (1965) 62 Cal.2d 571, 577-578 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Fischer* (1957) 49 Cal.2d 442, 446 [317 P.2d 967]; see Witkin, Cal. Criminal Procedure (1963) pp. 102-104; Fricke, Cal. Criminal Procedure (6th ed. 1962) pp. 19-20.) ■ Although the facts must incline the mind to believe, they may leave room for doubt. (*People* v. *Ingle* (1960) 53 Cal.2d 407, 413 [2 Cal.Rptr. 14, 348 P.2d 577].) Probable cause depends upon the measurement of probabilities (*Draper* v. *United States* (1959) 358 U.S. 307, 313 [3 L.Ed.2d 327, 79 S.Ct. 329]), based upon the unique facts of each particular case (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 479 [9 L.Ed.2d 441, 83 S.Ct. 407]). As we shall explain, the factual basis found to support probable cause in two recent exemplar cases, *People* v. *Hall* (1964) 62 Cal.2d 104 [41 Cal.Rptr. 284, 396 P.2d 700], and *People* v. *Schader*

(1965) 62 Cal.2d 716 [44 Cal.Rptr. 193, 401 P.2d 665], illustrates the sufficiency of the showing of probable cause here.

In *Hall* the arresting officer learned that the name called out by the victim in addressing her assailant was the same first name as that of defendant, that defendant knew the victim, that he appeared to be the only person with that first name known to the victim, and that he had a criminal record including assault with a deadly weapon. In *Schader* the arresting officer had been advised that the robber-murderers were travelling in an easterly direction in a late-model red Cadillac. Shortly thereafter, he saw such a car proceeding in the specified direction; moreover, the officer testified ''that he believed the youthful appearance and informal dress of the driver of the car presented a suspicious circumstance.'' (62 Cal.2d 716, at p. 722.)

The showing of the probability of the identity of defendant here as the perpetrator of the crime was far greater than in *Hall* or *Schader*; hence the arrest was based upon probable cause. Chief Deputy Thomas knew that at the time of the killing a car similar to defendant's uniquely painted black and turquoise 1952 Plymouth had been seen in Tome Lane, two-tenths of a mile from the scene of the crime. Officer Thomas had also seen the bootprints and tire prints in Tome Lane; he compared them visually with boots seen in, and the treads of the tires of, defendant's car, which he knew was parked in front of defendant's hotel and registered to defendant. He saw the condition of the victim's body; he knew that defendant had a prior record of conviction for forcible rape. He also knew of the victim's occasional employment as a babysitter at the farm where defendant worked. The probability of the independent concurrence of these factors in the absence of the guilt of defendant was slim enough to render suspicion of defendant reasonable and probable. Since the arrest was proper, the evidence seized incident to it could properly be admitted at trial.

### 2. *Introduction of evidence of defendant's prior offenses and failure of court to caution jury on the use of such evidence*

Defendant argues that the court committed prejudicial error in admitting the testimony of Mary Caeton to the effect that upon a prior occasion defendant attempted to enter her house by stealth and physical force for the likely purpose

of attempting a rape, an offense involved in the instant murder. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 704 [44 Cal.Rptr. 30, 401 P.2d 382].) We cannot accept defendant's contentions that such evidence should not have been introduced because it was not material and because he had not been convicted of any crime involving the witness. Nor can we concur in defendant's contention that, as to this testimony, the court failed to give the proper precautionary instructions.

We have upheld the admissibility in the penalty trial of "defendant's commission of criminal acts similar, or related, to the crime for which he is being tried." (*People* v. *Terry* (1964) 61 Cal.2d 137, 143 [37 Cal.Rptr. 605, 390 P.2d 381].) It does not aid defendant that his acts did not generate a conviction; in *People* v. *Mitchell* (1966) 63 Cal.2d 805, 815-816 [40 Cal.Rptr. 371, 409 P.2d 211], we said: "There is no requirement that a defendant must have been convicted in order to introduce evidence of other criminal conduct during the penalty phase. (*People* v. *Griffin* (1963) 60 Cal.2d 182, 190-191 [32 Cal.Rptr. 24, 383 P.2d 432]; *People* v. *Jones* (1959) 52 Cal.2d 636, 647-648 [343 P.2d 577].)"

 Although defendant contends that the court should have instructed the jury as to the Caeton testimony that such a "charge is easily made and difficult to disprove, and that for this reason the testimony of the prosecuting witness should be examined with caution," we note, first, that defendant did not request such an instruction (*People* v. *Stangler* (1941) 18 Cal.2d 688, 693 [117 P.2d 321]) and, second, that the court did give a proper cautionary instruction. Thus it thoroughly cautioned the jury that evidence of prior offenses may be considered only if believed beyond a reasonable doubt, complying with the rulings of *People* v. *Mitchell, supra,* 63 Cal.2d 805, 817, and *People* v. *Polk* (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641]. Before defining reasonable doubt, the court told the jury: "Evidence has been introduced for the purpose of showing that prior to the conviction of the offense for which you must now determine the penalty, the defendant may have committed other crimes. You are not permitted to consider that evidence unless and until the commission of such other crimes is proved beyond a reasonable doubt, and for that purpose you must weigh such evidence as you do all other evidence in the case."

### 3. Defendant's presence in prison garb
### and manacles before the jury

Defendant contends that the court committed prejudicial error by permitting him to appear before the jury in prison garb and in chains. The record does not disclose clearly whether the entire jury saw defendant thus manacled, but, even viewing the evidence most favorably to defendant, we cannot find such restraint unwarranted or prejudicial.

Apparently, on the first day of trial, defendant was brought into the courtroom and taken from it at the noon recess in manacles, in view of some members of the jury panel filing in or out of the courtroom. Defendant argues that this action created the inference in the mind of the jury that defendant was a dangerous man.

No evidence establishes that any member of the panel finally selected for the jury actually saw defendant in chains. Moreover, the evidence does show that defendant had resisted being brought into court that day, that he refused to dress for court, and that he had to be taken bodily from the prison to the court. The officers therefore did no more than reasonably perform their duty in taking added security precautions, including the use of manacles.

### 4. The refusal of instructions requested
### by defendant

Defendant asserts that the trial court committed reversible error by refusing to issue instructions based on language of *People* v. *Friend* (1957) 47 Cal.2d 749, 767-768 [306 P.2d 463] : ''[I]n deciding the question whether the accused should be put to death or sentenced to imprisonment for life, it is within their (the jury's) discretion alone to determine, each for himself, how far he will accord weight to the considerations of the several objectives of punishment [enumerated] . . . or of sympathy or clemency, of age, sex, human passions, ignorance or weakness, of the presumptions concerning, or the possibilities attaching to, life imprisonment, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever which in the light of the evidence, the duty they owe to the accused and to the state, and the law as explained to them by the judge, appears to them to be important.''

Defendant relies also on the statement in *People* v. *Anderson* (1966) 64 Cal.2d 633, 641 [51 Cal.Rptr. 238, 414 P.2d

366], that it is improper for a court to instruct a jury at the penalty phase that it may *not* be influenced by pity for the defendant or sympathy for him.

*Friend* was explicitly overruled by *People* v. *Morse* (1964) 60 Cal.2d 631, 637 fn. 2, 649 [36 Cal.Rptr. 201, 388 P.2d 33], with respect to comment on the possibility of parole. Moreover, the quoted language in *Friend* was directed at the scope of *permissible comment* and delineation of areas which jurors *may* consider. Such cases as *People* v. *Morse, supra, People* v. *Hines* (1964) 61 Cal.2d 164, 168-169 [37 Cal.Rptr. 622, 390 P.2d 398], and *People* v. *Terry* (1964) 61 Cal.2d 137, 154 [37 Cal.Rptr. 605, 390 P.2d 381], have recognized that the jury must decide the awesome question of life or death "without benefit of guideposts, standards or applicable criteria."

No error resulted from the court's rejection of defendant's proposed instruction, since that part which referred to deterrence was disapproved by *People* v. *Morse, supra,* 60 Cal.2d 631, and that part which enumerated factors for the jury's consideration was more correctly covered by another of defendant's requested instructions based upon *Morse, Terry,* and *Hines.* The court did instruct the jury that: "It is your duty to conscientiously consider all of the evidence admitted in arriving at your decision as to penalty. It is not essential to your decision that you find mitigating circumstances on the one hand or evidence in aggravation of the offense on the other. As to whether the defendant shall suffer death or confinement in a State Prison for life, the law commits the entire matter to your judgment and conscience based upon a sound and absolute discretion."

*Anderson* is clearly inappropriate to defendant's argument. To hold a negative instruction improper is not to require that the same instruction be tendered in the affirmative.

### 5. *Denial of defendant's motion for a mistrial on grounds of misconduct of jurors*

When defendant accepted his advisory attorneys in a full representative capacity on the second day of trial, after the jury had been selected, counsel moved promptly for a mistrial on grounds of improper *voir dire* and composition of the jury. Defendant claims that since Juror Hickey had been excused for cause at the first penalty trial, he should not have been permitted to serve on the second jury, that inconsistencies in his response to questions on *voir dire* constituted

misconduct, and that defendant did not knowingly and intelligently waive counsel at *voir dire*.

Defendant, during the first day of trial, doggedly refused to accept court-appointed counsel or to participate in the selection of the jury, despite the court's patient and persistent attempts to convince him of his need for assistance. The court virtually assumed the role of defense counsel in questioning prospective jurors.

When defendant's appointed counsel called to the attention of the court on the second day the fact that Juror Hickey had previously been excused for cause at the penalty trial three years before, the court conducted a further examination of Hickey in chambers. Hickey had been excused at the first penalty trial because of his acquaintance with Mr. Miller, the father of the victim. At the present trial, however, the court probed deeply into the nature of his relationship with Miller and found that Hickey had been only slightly acquainted with him before the first trial and had not seen him since that time. The court closely questioned Hickey's ability to render a fair and impartial verdict: "JUROR HICKEY: I guess I didn't understand the question just right. I thought it meant was I a personal friend of him, you know. I am not. . . . THE COURT: You are not saying that you didn't know any of these people because you just wanted to get on this jury, that is not it? . . . You told us you believed you had no fixed opinions or beliefs? JUROR HICKEY: No, I was going in there with a clear mind, and following instructions, to try to do it right. . . . THE COURT: Do you think you meet all of those qualifications, Mr. Hickey? JUROR HICKEY: Yes, I still believe I could."

Defendant claims that Juror Hickey should have been discharged because of his alleged misconduct, and, further, should have been disqualified because his answers to *voir dire* questions disclosed his "fixed opinion" on the issue of penalty. But surely the resolution of these questions rested with the trial court. The trial court conducted a hearing on the ground of the alleged misconduct; it weighed and decided the question of alleged discrimination. Even assuming that the evidence of misconduct was conflicting, "the trial court's resolution of that conflict is binding on the appellate court." (*People* v. *Daugherty* (1953) 40 Cal.2d 876, 890 [256 P.2d 911] ; *People* v. *Abbott* (1956) 47 Cal.2d 362, 371 [303 P.2d 730].)

### 6. *Discussion of legal issues with counsel in presence of jury*

Defendant asserts that the court committed prejudicial error in permitting a discussion of the admissibility of seized evidence in the presence of the jury. Unlike the counsel in the cases cited as authority by defendant, however, defense counsel made no request to exclude the jury. He initiated the comments himself, reiterating, in substance, the same arguments which he had previously urged upon the court in the absence of the jury, and which the court had rejected. Since there is no general rule that the court must hear legal arguments in the absence of the jury (*People* v. *Gonzales* (1944) 24 Cal.2d 870, 876 [151 P.2d 251]), the trial court certainly does not abuse its discretion in failing to excuse the jury during a legal argument when counsel does not request excusal.

### 7. *Disparagement of defendant and defense counsel*

The remarks of the court to counsel which defendant characterizes as prejudicially disparaging merely constituted a mild reprimand for counsel's incorrect citation of a case. The record as a whole reveals that the court treated defendant and defense counsel with the utmost consideration and respect.

Defendant raises no further issues of substance, and the record reveals none. The trial judge and the prosecutor conducted themselves with notable fairness toward defendant and in strict compliance with the law. Our review of the case discloses no basis for reversal.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Burke, J., Sullivan, J., and Roth, J. pro tem.,* concurred.

Appellant's petition for a rehearing was denied March 8, 1967. Roth, J. pro tem.,* sat in place of Mosk, J., who deemed himself disqualified. Peters, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.